# SUPREME COURT

OF THE

# TERRITORY OF KANSAS.

## DECEMBER TERM, 1858.

### JOHN M. FACKLER AGT. JOHN R. FORD AND OTHERS.

*Contract: Town Plats: Delaware Trust Lands: Consideration: Trusts.*

1. When a contract between private parties was made, in relation to the sale of Delaware Trust Lands, before the day of sale by government, wherein one party agreed to sell, and acknowledged payment for one-half of certain tracts to the other, agreeing to purchase at such sale, and to take up the title of another tract, to be purchased by another party who had previously agreed to purchase—said half so sold, to be divided according to a plat already made, but not filed, according to the statute regulating town plats (Stat. 1855, page 734); the same is not, by reason of these facts, illegal, and may be enforced.

2. Such contract is not contrary to the laws of the United States, nor in violation of the treaty with the Delaware Indians.

3. A consideration of a different character from that stated in the contract, can not be proven. The total failure may be proved, and also, that none ever existed.

4. A contract, part of which may be repugnant to law, and against public policy, the part not being so may be divided, and may be enforced.

5. While the features of contract may characterize an instrument, yet it may possess the essential elements of a trust, and may be enforced as a trust.

6. Having received $560, one-half of the purchase money of the land in controversy, and applied it to its purchase under this contract, Fackler can be treated as a trustee for the other co-contracting parties.

7. A general representation that, if the contract was made, the vendee had capital and would make improvements that would induce the immi-

John M. Fackler agt. John R. Ford and others.

gration of mechanics, etc., is not one to vitiate the contract, as it is an agreement to do nothing definite, and can not affect the original contract.

[NOTE.—This case was carried to the supreme court of the United States, and there affirmed. 24 Howard, 322. See Stone *agt.* Young, 4 Kansas, 17.]

APPEAL from the District Court of the First Judicial District in and for Leavenworth County.

The original bill of the now defendants in error was filed August 21, 1857, in the first district court in Leavenworth county. An amended bill was filed January 29, 1858. The separate answer of John M. Fackler was filed June 1, 1858. The contract referred to in the bill, is as follows:

"Know all men by these presents, that we, John M. Fackler and Madison Mills, have this day bargained and sold by quit claim, and do hereby agree to sell and make quit claim deed to John R. Ford *et als.*, forty shares in Fackler's addition to Leavenworth city, south of South Leavenworth, being one hundred and forty acres of land, laid out by said Fackler and Mills, as Fackler's addition, which shares are divided and agreed to be the following shares, etc. [here follows a description, in detail], for and in consideration of said lots, the vendees have paid to said vendors the sum of ten thousand dollars, and agree to pay one-half of the purchase money to be paid at Delaware sales for land hereby sold. And the said Fackler and Mills hereby agree to make a quit claim deed, and to the said vendors, when the said grounds are purchased at the present sales of Delaware lands now selling at Fort Leavenworth. It is understood that the 140 acres which has been laid off into town lots and divi-

DECEMBER TERM, 1858.        23

John M. Fackler agt. John R. Ford and others.

ded into 80 shares, 40 shares of which are sold by this agreement, is composed of a fractional quarter, containing 60 acres, claimed and occupied by John M. Fackler, and which he will buy at said Delaware land sales; and, when he gets the title, he will make quit claim deed to the lots within said fraction to said vendors, or to such person as they may designate—the other 80 acres, making up the other 140 acres, is the east half of the quarter section claimed by said M. Mills. It is understood that the said Mills sold the west half of said quarter to Joseph A. Bullen, who is to purchase the whole quarter at the Delaware land sales, and when purchased he is to convey by quit claim deed, the east half of said quarter to John M. Fackler, who is to convey to said vendors, or such person or persons as they may designate, the shares or lots within said rights by quit claim deed. It is understood and agreed that one of the 40 shares hereby sold is to be by them appropriated to school, church and public purposes, the said vendors agree to appropriate one of their shares to the same purpose, unless the parties vendors or [and] vendees shall agree otherwise. The said Fackler and Mills also sell, as a part consideration of said payment of ten thousand dollars, the receipt of which is before acknowledged, the undivided half of the ferry right and privilege from the south part of Fackler's addition to the Missouri side, and an undivided half of the lease of ground on the Missouri side, the said vendees agreeing to pay half of the annual rent for the land leased on the Missouri side, being fifty dollars from January

next, and to which they agree to make a quit claim deed." Dated Nov. 22, 1856. On the same paper is this receipt: "Rec'd of Ford, Bishop and others, vendees within named, the sum of five hundred and sixty dollars ($560), being one-half of the aforesaid value of the land described in the within contract, which we are to use in paying for said lands at Delaware sales, held at Fort Leavenworth, this 22d Nov., 1856.

"J. M. FACKLER."

*By the Court*—LECOMPTE, C. J.

This is a bill filed on the equity side of the first district court, for the specific performance of a contract. The contract was made under the following circumstances: In 1856, the defendants, John M. Fackler and Madison Mills, were the claimants and in possession of one hundred and sixty acres of land, consisting of two adjoining half-quarter sections. The land itself was part of what is known as the Delaware Trust Lands, acquired by the United States in the mode, and for the purposes therein expressed, under the treaty with the Delaware Indians, bearing date the 6th day of May, A.D. 1854. The defendants, so in possession, had, before the date of the contract, determined to lay off the land into blocks and lots, as an addition to the city of Leavenworth. They had actually so laid it off, but without complying with the requirements of the statute of the territory requiring plats to be filed, etc. While such was the relation of the defendants to the land in controversy, and while they claimed to hold, also, certain ferry privileges at

John M. Fackler agt. John R. Ford and others.

and from the addition to Leavenworth city across the Missouri river, to the state of Missouri, and a lease of ground on the Missouri side, they and the complainants entered into a contract, by which, in brief, for and in consideration of the sum of ten thousand dollars, paid by the complainants to the defendants, the latter agreed to obtain the title to the land mentioned in Kansas, and after so obtaining it, to convey the one undivided half thereof and all their right to the ferry privileges and lease to the complainants. One half-quarter being in the actual possession of one Bullen, it was understood and stipulated in the contract that he should purchase this at the approaching sale of the Delaware lands, and convey it to Fackler, while Fackler himself should purchase the other. He being thus in the legal ownership of the whole, obliged himself to convey to the complainants. Appended to the contract is a receipt for the sum of five hundred and sixty dollars, being one-half of the appraised value of the lands, to be used in paying for the said lands at the Delaware land sales at Fort Leavenworth.

Shortly afterward the lands were purchased, one-half quarter by Fackler, the other by Bullen or Day, and conveyed to Fackler. Thereafter he refused to make the conveyance, and the complainants filed their bill invoking the aid of the court sitting in equity, to enforce the performance of the contract. The proceedings are voluminous. A very brief recital of the proceedings only will be necessary to indicate the points presented for adjudication. The original bill was substituted by an amended bill, and upon this amended

bill the whole proceedings in the case depend. To
the amended bill the defendant Fackler filed his de-
murrer, presenting thereby that the contract was an
illegal one, as being in violation of law and against
public policy, and not such a one as the courts would
enforce. After argument and before entering of judg-
ment, leave was allowed him to withdraw his demurrer
and to answer. His answer being filed, exceptions
thereto were filed. Thereupon a motion is filed by
the defendants to strike off the file the exceptions.
This is sustained and leave granted to plead, reply or
except within ten days. Thereupon motion to ex-
punge impertinent matter is filed, specifying the par-
ticular matters of the answer to be expunged, and also
exceptions to the answer particularizing the grounds
of the motion. Then follows motion to strike out
" Motion to strike out parts of answer and exceptions
to answer." The case was heard upon the motion to
strike out parts of the answer, made by solicitors of
the complainants. This motion was sustained by the
court below, and the parts excepted to ordered to be
stricken out. Whereupon exceptions are taken and
signed and sealed. Exceptions to answer are with-
drawn, and a decree was entered for the specific per-
formance of the contract. Thus is the case presented
to this court for revision, and the question is whether
or not there is error in the judgment of the court
below, by which the parts of the answer excepted
to were stricken out, or in the final decree for a spe-
cific performance of the contract.

Though the question be thus, a single one, its solu

tion involves several subsidiary ones of no little difficulty and of great importance. A particular examination of all that have been presented would extend this opinion beyond the bounds to which prudence would restrict it.

An entire oversight of these would not be excusable. As presented by the answer of the defendants and the motion to expunge they are—

*First.* Whether a failure, on the part of the defendants, to comply with the statutes of the territory, requiring the filing of a plat of the town before sales of lots, will justify the courts in withdrawing their remedial agency upon an application for specific performance?

*Second.* Whether the sale or contract of sale was contrary to the laws of the United States, in a sense to be therefore void; or, if not void but voidable, a protection in a court of equity against the enforcement of a specific performance?

*Third.* Whether the sale in question was in violation of the rights of the Delaware Indians, or if so, whether such a plea is a defense in the mouths of these defendants?

*Fourth.* Whether considerations additional to those specified in the written contract may be set up in defense against a specific performance; and, if so, whether these defendants are entitled to use them; and if so, whether those set up in the answer are such as would avail them?

*Fifth.* Whether courts of the United States may entertain as defense, allegations impugning the integrity of the executive branch of the government?

There is yet another question arising necessarily upon the record, though not directly presented by the issues of the answer and motion to expunge. It is whether a resulting trust would not arise upon the contract; or, if not, whether, taken as a whole, or waiving the contract of the body of the instrument, the receipt appended to it does not constitute or create an express trust?

The first question is disposed of by either one of the two positions taken by the counsel for the plaintiffs. The statute in imposing the prohibition it does, must be understood as intending protection to purchasers. If, in disregard of the law, the owner undertake to sell, and having received the money for his land, shall then be entitled to protection against a specific performance of his contract, it is most evident that he is allowed to avail himself of a violation of law, by himself, for his own protection. The evident injustice of this must strike the mind with conclusive force. Calling upon the court to aid them in the collection of money claimed to be due by virtue of such a sale, they would be met and defeated by their own violation of law; but not so the purchaser, who ought rather to expect sympathy, as being the victim of misplaced confidence, than rebuked as a wrong-doer.

Another satisfactory solution of the question is found in the doctrine of the case in 20th Howard, 558.

The land in question was not subject to legislation of the territory impugning or affecting the rights of these parties.

To the second question are no less applicable the observations on the first view of the preceding question. In addition to this, it may be remarked in confirmation, that the act of Congress referred, and which is supposed to offer an impediment to the enforcement of this contract, by its very terms provides redress for the purchaser. It declares the contract void indeed, but explains by its own provision that it intends to avoid it as against the vendor.

That it offers no impediment to the enforcement of the contract in this case, avoids the necessity of an inquiry whether the statute is really in force as to the land, the subject of this suit. It is supposed to be applicable by reason of a provision of the treaty with the Delawares.

Whether it be really so would involve many grave inquiries as to the competency of the treaty-making power to enact laws, or to apply by so providing in the treaty, laws already made to land procured by virtue thereof. The high obligations of treaties is abundantly secured by the constitution itself; but whether there be not some things beyond the reach of treaty stipulations, is a question of a very different kind. But as already said, all necessity for the discussion of this question is lost in the conviction that the provisions of the act of Congress offer no impediment to the claims of the plaintiffs or complainants.

The third question suggests inquiries into the interests and rights of the Delaware Indians, more properly, perhaps, another phase of the second, than an independent question. If the rights of these Indians

have been infringed so as to affect the rights of the parties litigant, it would seem necessary that this wrong should have been committed by one or the other of them, if so as to affect prejudicially the rights of the complainant (appellee), than because they have committed the wrong.

The nature of the case would indicate, undeniably, that if injustice has been done, it must have been by the government of the United States. There is manifest impossibility in its having been wrought by the defendants. Can the commission of injustice be predicated of the sovereignty of the republic? May the courts open their records for the entertainment of such charges? Not to say how in conflict such a proposition is with those rules of proceeding, which guard against multiplicity and eschew the introduction of collateral issues, and the determination of questions *coram non judice*, necessary as those rules are to protect both courts and territories against interminibility of litigation, how strange to ask that the doings of those not parties to the record shall become leading issues; how much more strange that the courts, the creatures of the constitution and the laws, shall be asked to hear the sovereignty, above suit, above wrong, implicated in outrage and injustice. The allegation is scandalous, and if not found cited as the highest instance of that scandal of which courts of equity are sedulous to purge their records, only so because, like parricide, its enormity was supposed to be too great to be regarded as committable.

If any wrong has, or could, in the nature of the

case, have been committed by any of the parties to this suit, it would hardly seem susceptible of contradiction that it could only be by the defendants. He can not, therefore, claim any benefit of the rule of equity, by which *particeps* in wrong are left where they are found, in the feelings of disgust which restrains the courts exercising this species of jurisdiction, from attempting a settlement of their tainted controversy.

In so far as the charge is direct upon the complainants for complicity, it is that they confederated with the United States. This can not be entertained because scandalous, as already said; but it is as little entitled to be heard because of its apparent moral impossibility.

As a question of law or equity, the fourth is the only one which the defendant has been in a position to have urged. Whether he has been, or is, in such condition is one of no little interest and importance. It may often happen, and does, that a contract does not contain all that it ought, in justice to the parties to it. It may happen from mistake, and does. It may happen from a neglect, transient, or the result of incapacity to appreciate its importance, and does. It may arise from the generous sentiment of mutual or partial confidence, and does. It may occur as the fruit of a device of fraud, bred in the purpose to overreach and wrong, and does. It is thence that, while feeling the necessity of the restraints of the principles of the statutes of frauds and perjuries, and fearful, and justly so, of the dangerous tendencies of a

judicial relaxation of their requirements, while hold-
ing in their full force the greater certainty and the
more exact justice of an adherence to the terms of a
written contract; and careful, and justly so, not to
destroy these barriers against the evils of unfaithful,
or it may be corrupt testimony, courts have, never-
theless, been driven by their stern obligations to
advance right and justice, and to restrain oppression
and wrong, to depart, though cautiously and pru-
dently, from the strict letter of the law.

How else shall be hindered the achievement of his
purposes, if once the designer of fraud shall succeed
in procuring the omission of some one thing neces-
sary to the absolue justice of the contract?

It can not seem strange that they have recognized
as doctrine that the incidents of human transactions,
mistakes, loss, etc., may be remedied, and that, with
unabated tenacity, they have regarded their highest
duty to be to impede the ways of fraud.

The consequence has been to qualify, to some
extent, the letter of the law. Adjudications to this
result have, more frequently than in other cases, arisen
in applications like this for the specific performance of
a contract. At an early period, holding that this was
matter of right but to be awarded, in the exercise of
sound judicial discretion, upon a clear perception of
the inherent equity of the demand, the courts have,
as is unavoidable in the administration of justice on
such a basis, sometimes occupied apparently irrecon-
cilable positions. With but little disagreement in
their appreciation of the principles, their application is

not always entirely harmonious. Upon this very question, the enforcement of specific performance, its liability to be refused, the nature and extent of the right to demand it, the decision of the state of New York illustrating what is no less true of the mass of judicial decisions, show how, even in the maturity of legal learning of the current day, a series of interpretations, under slight variations of enactment, will vibrate, tending sometimes to one and sometimes to the other side of the medium construction. It may not be said, indeed, that there is no conflict even in the announcement of the principles. Authorities are not wanting which tend to the absolute exclusion of any greater or different consideration from that expressed in the contract. 1 Johns. 139 ; 3 id. 506–7 ; 7 id. 341 ; 6 Cowen, 690.

While a modification of this doctrine must be conceded to be the rule of the aggregate decisions, the discrepancies in most cases might be, either wholly or to a large extent, modified by analysis. Indeed, they are much qualified by the consideration that, expressing themselves with single reference to the pending case, judges not unfrequently use general expressions capable, indeed, of being understood, but not intended to be understood as announcing a principle more general than the case by which is was elicited. But conceding that, as a general rule, the consideration may be looked into beyond that expressed in the contract, the defendants claim that this only is permissible in collateral inquiries, and never to defeat the conveyance.

While decisions have certainly given color to this

3

argument, a closer analysis of the cases supposed to sustain, do not go so far, while certainly others hold the conveyance itself to be suspended upon the same liability. The cases, 7 Eng. Law and Eq., p. 76, 3 Rand. 537, allowed the consideration to be inquired into beyond the written contract, when the very purpose of the proceeding was to obtain a specific performance, and the sole inquiry, *vel* or *non*, it should be decreed.

We can not regard it as a safe deduction from the authorities that no relief can be given against specific performance, by an inquiry into considerations besides those written, but we do hold that to justify a refusal upon such defense, there must be a much stronger case than is offered by the defendant in this case. We can not pretend to analyze the numerous authorities referred to in the argument in Massachusetts, Ohio, Pennsylvania, New York, Virginia, and elsewhere. Those we have named, with the leading case in 16th Wendell, are sufficient to be mentioned.

The fifth question is sufficiently answered in the observations that have been made upon the third.

Without an elaborate examination of the cases which the research of counsel has exhibited, we propose briefly to state the disposition of the case under review, which would necessarily follow, even had we reached different conclusions upon the questions already mentioned. Regarding the views that have been presented upon the subject of trust estates, the following, it seems to us, are but legitimate deductions of sound principles of equity jurisprudence and of authoritative adjudications.

1st. That a contract, part of which may be repugnant to law, and against public policy, a part not being so, may be divided, and so much as may be unexceptionable, enforced.

2d. That while the features of contract may distinguish. the instrument, it may still possess the essential elements of a trust, and while, as contract, unsusceptible of enforced execution, the trust itself may be enforced.

3d. As to the character of the certain transaction in question, that even if obnoxious to objections which would prevent its enforcement as a contract, it is easily susceptible of being regarded as creative of an implied trust, growing out of the payment of money by the complainants to the defendants.

4th. If this were otherwise, that still there is before us, as the unquestionable consequence of the receipt of five hundred and sixty [dollars,] for the purpose, of the particular purpose, through which the defendant claims the actual undenied purchase by him, an express trust, which the complainants are entitled to have executed.   5 Barr, 81; 1 Jones, 207; 5 Cowen, 564.

There is another view of the subject which ought not to be overlooked.   It has been said, already, that the exercise of a sound judicial discretion is allowed the courts, in judging of the claim of the complainants to a specific enforcement.   If, on the contrary, the defendant ask to be allowed to interpose a defense against specific performance, it must follow that the same grave discretion must be exercised.   As an ele-

ment of most controlling influence the materiality and the specific character of the proposed defense, are to be regarded.

Is there any allegation by the defendant, in the whole of those prayed to be expunged, that the complainants had expressly stipulated and agreed to do any particular, material thing, as part and parcel of the consideration of the sale   We think not.   There is a want of definiteness, both as to the substance or matter of what was to be done, and as to the engagement or promise to do it.   No particular work is charged to have been undertaken, suppose there to have been an undertaking.

To say nothing of so much of the charge as relates to what the complainants said they had done, and what were the circumstances of the country and the *modus operandi* of the affairs of the country, we think it can not safely be regarded as defensive matter that they proposed in the event of having a large interest to give away lots, to induce mechanics to come to the country, etc.   But more than this the allegation wants distinctness of any undertaking whatever.   The language used, in making the charge, is that the complainants said what they "could," not what they would do.   The latter is the language of obligation, the former of assumption and gasconade.   There is not such an engagement or obligation alleged, either in the manner or the matter, as makes a defense.   If it were all conceded to be true, it would furnish to our minds no reason why the complainants should not have a specific performance of the contract, or an execution

of the trust.    But does the defendant occupy a position in this case, the circumstances of which address themselves favorably to the court for protection, it being in the exercise of a sound legal discretion?

To this the whole proceeding is full of negative response.    He presents no claim to the favor of this discretion, because

*First*.  Coming into court under its subpœna to answer a demand arising upon the payment of a large sum of money, he plants himself upon supposed legal impediments against the enforcement of a contract, with which, apparently, he was under the highest moral obligations to comply.

*Second*.  Because so coming into the defense of the allegations and admitting the receipt of the money, he nowhere, at any time, tenders a return of the money received by him, but, proposing to shelter himself under legal impediments, would grossly retain the large amount paid him, and with which, for aught that appears, he became possessed of the property, and without which, so far as the case discloses, it may be, he could not have made the purchase.

*Third*.  Because himself, as fully as any other person, the beneficiary of the liberality of the government in the disposition of the Delaware trust lands, and surely as deeply implicated as any other person in the fraud concealed under this liberality, if any could be entertained in the court, quietly enjoying the fruits of the transaction, rashly and unwarrantably charges upon the government, by which he is protected and favored, outrages which can not be predicated, only of the most corrupt and unprincipled.

*Fourth.* Because, not only being in the possession of so much of the land as was purchased by himself, he is also in possession of forty acres, one-half of the whole, purchased by another in conformity with the contract, and conveyed to him in conformity therewith, he proposes to retain this as well as the other, nowhere expressing either willingness to account with these complainants or the grantor to him, or proposing to defend the rights of said grantor at his instance or request.

*Fifth.* Because, while this is the fact as to Bullen or Day, whichever may have become the instrument to effectuate the purposes of the contract, as to the particular forty acres, the other party, obligor in the contract, by his silence, at least, and by the dealing of the complainants toward him, sees and feels the justice of the demand of the complainants, and interposing no objection to the attainment of their rights, the defendant, without his concurrence, and unmindful of his interest or rights, tenaciously proposes to hold, not only his own, but the interests alike of his original co-defendants, of the complainants, and of the third party.

*Order.*—This cause came on to be heard on the transcript of the record from the first district court of the United States for the territory of Kansas, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court that the decree of the said first district court in this case be, and the same is hereby affirmed, with costs; and

judgment is now here entered against the said appellant and his sureties for said costs.